**UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA
RENO, NEVADA**

| | |
|---|---|
| TREASURY SOLUTIONS HOLDINGS, INC., ) <br> A Georgia corporation, TREASURY ) <br> SOLUTIONS, LLC., a Georgia limited ) <br> liability company, ) <br> ) <br>     Plaintiffs, ) <br> ) <br> vs. ) <br> ) <br> UPROMISE, INC., a Delaware ) <br> corporation; UPROMISE INVESTMENTS, ) <br> INC., a Delaware corporation; THE ) <br> VANGUARD GROUP, INC., a ) <br> Pennsylvania corporation; JOHN ) <br> DOES 1 through 10, individuals; ) <br> ABLE-BAKER COMPANY 1-10, ) <br> partnerships; and BLACK & WHITE ) <br> INC. 1-10, corporations, ) <br> ) <br>     Defendant. ) <br> ) | 3:10-CV-00031-ECR-RAM <br><br><br><br> **Order** |

This case involves allegations of tortious interference with contractual relationship and tortious interference with prospective business advantage.

Plaintiffs Treasury Solutions, Holdings, Inc., and Treasury Solutions, LLC. filed a complaint (#1-1) against Defendants Upromise, Inc., Upromise Investments, Inc., The Vanguard Group, Inc., and Vanguard Marketing Corporation, alleging that Defendants tortiously interfered with their contractual and prospective business relationship with the State of Nevada.

Now pending are two motions to dismiss.  The motions are ripe, and we now rule on them.

### I. Background

Plaintiff Treasury Solutions Holdings, Inc. is a Georgia corporation formed in December 2007 as successor to Treasury Solutions, LLC.  (Am. Compl. ¶ 3 (#45).)  Treasury Solutions, LLC is a Georgia limited liability company formerly known as GIF Plan Advisors, LLC.  (Id.)  GIF Plan Advisors, LLC was an affiliate to GIF Services, LLC. ("GIF"). (Id.)

Defendant Upromise, Inc. ("Upromise") is a Delaware corporation with its principal place of business in Newton, MA.  (Id. ¶ 5.)  Defendant Upromise Investments, Inc. ("UII") is an Upromise, Inc. subsidiary, and a Delaware corporation with its principal place of business in Newton, MA.  (Id. ¶ 6.)  The Vanguard Group, Inc. ("Vanguard") is a Pennsylvania corporation with its current principal place of business in Pennsylvania.  (Id. ¶ 7.)

The facts as alleged in the amended complaint are as follows.  GIF submitted a proposal to the State of Nevada whereby the company offered to fast track the development of a multi-manager college savings plan ("CSP").  (Id. ¶ 14.)  GIF was selected as "Plan Advisor" by the State of Nevada.  (Id. ¶ 15.)  GIF, as Plan Advisor, assisted in the drafting of the proposed legislation, designed a plan for a multi-manager CSP, interviewed financial institutions, and provided all necessary staffing and funding.  (Id. ¶ 17.)  The compensation for GIF was designed similarly to that of a securities lending program with a predetermined split of future revenues under

2

which GIF was to be paid one third of future program fees and the State of Nevada was to be paid two thirds. (Id. ¶ 18.)

In March 2002, UII became a Program Manager for the Nevada CSP, and received approval to be Program Manager for the Vanguard 529 College Savings Plan. (Id. ¶ 21.)

On or about December 3, 2002, GIF assigned its rights under the contract to GIF Plan Advisors, LLC, an affiliate dedicated solely to serving as Plan Advisor. (Id. ¶ 22.) In July 2005, GIF Plan Advisors, LLC changed its name to Treasury Solutions, LLC. (Id.)

During 2003-2004, Plaintiffs conducted a compliance review of the Nevada CSP and discovered that Upromise was violating contractual requirements of the Nevada CSP. (Id. ¶ 24.) Plaintiffs reported the violations to the Nevada State Treasurer's office, and Upromise agreed to provide the State of Nevada additional compensation going forward. (Id.) This turn of events caused animosity and resentment by Vanguard and Upromise against Plaintiffs. (Id. ¶ 25.)

On or about March 9, 2004, the State of Nevada and Treasury Solutions, LLC entered into the first amendment to the Plan Advisor contract, which Plaintiffs attached to the amended complaint. (Id. ¶ 26.) The amendment reduced Plan Advisor fees and extended the contract term to December 31, 2031. (Id.) The amendment also provided that Nevada could amend the CSP program to adjust program fees with the result that thirty-three and one-third percent of the adjusted fee would accrue to the Plan Advisor in lieu of the fees it otherwise would have received. (Id. ¶ 27.)

3

In May 2006, the Plan Advisor agreement was amended to further reduce the fee paid to the Plan Advisor, to eliminate the continuation of services that the Plan Advisor would otherwise have been obligated to provide, and to cap fees owed to the Plan Advisor based on accounts and assets established prior to December 31, 2006. (Id. ¶ 28.) Under the amendment, Treasury Solutions, LLC would still receive one-third of the program fees, but only program fees associated with those accounts that were opened prior to December 31, 2006. (Id.) As consideration for the reduction in fees, Treasury Solutions, LLC would no longer be obligated to provide plan advisory services. (Id.) After May 2006, the State of Nevada did not retain the services of another plan advisor or financial advisor with regard to its CSP, relying on Upromise for advice. (Id. ¶ 29.)

Plaintiffs allege that Defendants sought to eliminate any involvement that Plaintiffs had in the Nevada CSP program. (Id. ¶ 30.) Upromise negotiated with Plaintiffs to purchase Plaintiffs' contract with the State of Nevada that allowed for the receipt of one-third of the program fees of all accounts opened prior to December 31, 2006. (Id. ¶ 31.) According to Plaintiffs, when negotiations fell through, Upromise conspired with Vanguard to inappropriately obtain, through fraud and coercion, without right or leave and with intent to keep, the program fees owed to Plaintiffs. (Id. ¶ 32.)

Specifically, in 2006, Jim Fadule, President of UII and Upromise, Inc., and/or other employees or representatives of UII began to pressure, tell, coerce or otherwise suggest to the Nevada State Treasurer's Office and the Board of Trustees of the College

4

1 Savings Plan that the State should conclude its contract with
2 Plaintiffs. (Id. ¶ 33.)
3     In October 2006, Ed Ferko, Senior Manager for the Education
4 Markets Group for Vanguard sent an email to Brian Krolicki, State
5 Treasurer of Nevada and Janice Wright, Senior Deputy Treasurer,
6 urging them to breach the contract with Plaintiffs.  (Id. ¶ 34.)
7 Plaintiffs attached a copy of the email to the amended complaint as
8 Exhibit 5.  Janice Wright stated in response that "Jim [Fadule of
9 Upromise] is getting Vanguard to give us a push," which Plaintiffs
10 characterize as an acknowledgment that Defendants were acting in
11 concert to coerce the State.  (Id. ¶ 35.)
12     In December of 2006, Vanguard reduced the fees it was
13 collecting from account holders of its Nevada plan. (Id. ¶ 36.) This
14 reduction in fees was "bound to the overall restructuring
15 represented by the proposed second amendment to the Upromise
16 agreement" which had not yet been approved.  (Id.)  Plaintiffs
17 allege that Vanguard's actions prevented Upromise from collecting
18 the program fees required by its contract with Nevada, a breach of
19 the Plan Advisor Contract.  (Id.)
20     On or about December 28, 2006, the State of Nevada approved
21 Amendment #2 to the Direct Program Management Agreement with UII
22 calling for the termination of the existing contract with the Plan
23 Advisor, the Plaintiffs, and assignment to UII of the fees
24 previously being paid to Plaintiffs under Plaintiffs' contract with
25 the State of Nevada. (Id. ¶ 37-38.)  A copy of the amendment is
26 attached as Exhibit 4 and incorporated by reference in the amended
27 complaint.  The amendment to the UII contract provided for the
28

5

1  Program Manager to retain fees that the State of Nevada had
2  contracted to be paid to Treasury Solutions as Plan Advisor, and
3  required that the Plan Advisor agreement between Nevada and
4  Plaintiff be terminated or assigned to UII.  (Id. ¶ 38.)  A
5  condition of the amendment was that the contract with the Plan
6  Advisor be closed out by December 15, 2006.  (Id. ¶ 45.)  Although
7  the contract has not been closed out, the State breached the Plan
8  Advisor contract by not paying consideration owed to Plaintiffs in
9  over three years.  (Id. ¶ 45.)  Plaintiffs allege that through this
10 amendment, UII modified its obligations to the State of Nevada and
11 circumvented and eliminated the involvement and influence of
12 Treasury Solutions as Plan Advisor.  (Id. ¶ 52.)
13     Plaintiffs claim that Treasury Solutions has received no
14 compensation under its contract with the State of Nevada since
15 January 2007, and Defendants have collected and retained those fees
16 contractually obligated to be paid to Treasury Solutions, and paid
17 to the State of Nevada other fees contractually obligated to be paid
18 to Treasury Solutions.  (Id. ¶ 49.)
19     Plaintiffs allege that on or about December 29, 2006, they
20 discovered that Defendants had acted to and succeeded in
21 circumventing, interfering, and obstructing the Treasury Solutions
22 contract with Nevada, particularly the compensation provisions of
23 that contract.  (Id. ¶ 52.)  In January 2007, Treasury Solutions
24 notified the Nevada State Treasurer of its concern, and in May 2007,
25 the Nevada State Treasurer's Office sent to Treasury Solutions a
26 Termination Agreement for consideration.  (Id. ¶ 56.)  Treasury
27 Solutions did not agree to the termination.  (Id. ¶ 57.)  On or
28

6

about December 27, 2007, Treasury Solutions, LLC. assigned all of its rights under the contracts and amendments to Treasury Solutions Holdings, Inc.  (Id. ¶ 53.)

On December 28, 2009, Plaintiffs filed suit for tortious interference with contractual relations and tortious interference with prospective business advantage in the Second Judicial District Court of the State of Nevada in and for the County of Washoe.  On January 15, 2010, Defendants Upromise and UII removed the action to federal court, invoking our diversity jurisdiction.  (Notice of Removal (#1).)  On January 20, 2010, Defendants Vanguard and VMC joined in the notice of removal.  (Joinder (#8).)

On December 22, 2010, the Court dismissed Plaintiff's first complaint (#1-1) pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state claims upon which relief may be granted.  The Court granted leave to file an amended complaint.  On February 4, 2011, Plaintiffs filed their first amended complaint (#45).

On March 8, 2011, Defendants Upromise Investments, Inc. and Upromise, Inc. filed a Motion to Dismiss the First Amended Complaint Pursuant to Federal Rule of Civil Procedure 12(b)(6) (#48) ("Upromise MTD").  On April 8, 2011, Plaintiffs opposed (#53) the Upromise MTD (#48).  On May 2, 2011, Defendants Upromise Investments, Inc. and Upromise, Inc. filed a reply (#57) in support of the Upromise MTD (#48).

On March 8, 2011, Vanguard filed a Motion to Dismiss Plaintiff's First Amended Complaint (#49) ("Vanguard MTD").  On April 8, 2011, Plaintiffs opposed (#52) the Vanguard MTD (#49).  On

7

May 2, 2011, Vanguard filed its reply (#56) to the Vanguard MTD (#49).

## II. Motions to Dismiss Under Fed. R. Civ. P. 12(b)(6) (##48, 49)

### A. Standard

Courts engage in a two-step analysis in ruling on a motion to dismiss. Ashcroft v. Iqbal, 129 S. Ct. 1937 (2009); Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007). First, courts accept only non-conclusory allegations as true. Iqbal, 129 S. Ct. at 1949. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. (citing Twombly, 550 U.S. at 555). Federal Rule of Civil Procedure 8 "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." Id. Federal Rule of Civil Procedure 8 "does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." Id. at 1950. The Court must draw all reasonable inferences in favor of the plaintiff. See Mohamed v. Jeppesen Dataplan, Inc., 579 F.3d 943, 949 (9th Cir. 2009).

Although courts generally assume the facts alleged are true, courts do not "assume the truth of legal conclusions merely because they are cast in the form of factual allegations." W. Mining Council v. Watt, 643 F.2d 618, 624 (9th Cir. 1981). Accordingly, "[c]onclusory allegations and unwarranted inferences are insufficient to defeat a motion to dismiss." In re Stac Elecs., 89 F.3d at 1403 (citation omitted).

Review on a motion pursuant to Fed. R. Civ. P. 12(b)(6) is normally limited to the complaint itself. See Lee v. City of L.A.,

250 F.3d 668, 688 (9th Cir. 2001). If the district court relies on materials outside the pleadings in making its ruling, it must treat the motion to dismiss as one for summary judgment and give the non-moving party an opportunity to respond. FED. R. CIV. P. 12(d); see United States v. Ritchie, 342 F.3d 903, 907 (9th Cir. 2003). "A court may, however, consider certain materials — documents attached to the complaint, documents incorporated by reference in the complaint, or matters of judicial notice — without converting the motion to dismiss into a motion for summary judgment." Ritchie, 342 F.3d at 908.

If documents are physically attached to the complaint, then a court may consider them if their "authenticity is not contested" and "the plaintiff's complaint necessarily relies on them." Lee, 250 F.3d at 688 (citation, internal quotations, and ellipsis omitted). A court may also treat certain documents as incorporated by reference into the plaintiff's complaint if the complaint "refers extensively to the document or the document forms the basis of the plaintiff's claim." Ritchie, 342 F.3d at 908. Finally, if adjudicative facts or matters of public record meet the requirements of Fed. R. Evid. 201, a court may judicially notice them in deciding a motion to dismiss. Id. at 909; see FED. R. EVID. 201(b) ("A judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.").

9

B. Discussion

Defendants contend that Plaintiffs' claim is time-barred. The statute of limitations for intentional interference with contractual relations is three years. Stalk v. Mushkin, 199 P.3d 838, 841 (Nev. 2009).

Under Nevada law, a plaintiff claiming intentional interference with contractual relations must establish "(1) a valid and existing contract; (2) the defendant's knowledge of the contract; (3) intentional acts intended or designed to disrupt the contractual relationship; (4) actual disruption of the contract; and (5) resulting damage." J.J. Industries, LLC v. Bennett, 71 P.3d 1264, 1267 (Nev. 2003). Defendants assert that a claim for intentional interference with contractual relations accrues when the defendant acts to terminate or disrupt the subject contract, not when termination becomes effective as a matter of law. (Upromise MTD at 21 (#48).) Therefore, according to Defendants, Plaintiffs' claim accrued on October 26, 2006, when Vanguard sent the allegedly tortious email to the State Treasurer advising that the State close out its contract with Plaintiffs, or at the latest, at the public meeting on November 17, 2006, when the CSP Board unanimously approved Amendment #2 to the Upromise Agreement, committing the State to close out Plaintiffs' contract.

Plaintiffs argue that accrual does not occur until the State actually breached its contract with Plaintiffs. Both parties agree that Nevada does not have caselaw directly on point. While Plaintiffs cite no cases in support of their assertion, we agree with Plaintiffs that a tortious interference with contractual

10

relations claim does not accrue unless there is actual disruption of the contract, whether it is anticipatory or immediate.

Defendants cite a number of cases in support of their claim that a tortious interference claim accrues when a defendant acts to disrupt the contract. We disagree, however, with Defendants' interpretation of the cases, at least to the extent that Defendants are implying that a claim accrues before there is any indication that a defendant's actions actually caused damages or will cause damages to a plaintiff. Simply acting in a manner to disrupt a contract cannot be enough for a claim unless those acts result in disruption to the contract.

In <u>Collum v Chapin</u>, the plaintiff alleged that defendants interfered with the plaintiff's contractual relationship with the Postal Service. 671 A.2d 1329, 1332 (Conn. App. Ct. 1996). The appellate court held that the trial court properly concluded that at the latest, the limitations period began to run on the date that the Postal Service wrote the letter rejecting plaintiff's proposal and thereby terminating the contractual relationship. <u>Id.</u> In response to the plaintiff's argument that the limitations period began when the plaintiff received the letter, the court stated that the decision by the Postal Service not to do business with the plaintiff was final and complete on the date the Postal Service wrote the letter. <u>Id.</u> n. 3.

Nor does <u>Black v. Ansah</u> support Defendants' argument. 876 So.2d 395, 399 (Miss. Ct. App. 2003). The court noted that a person with known and measurable harm that awaits solely the passage of time to inflict itself may sue before the damages actually occur. <u>Id.</u> In

11

that case, the plaintiff was told in May 1999 that she would no longer be employed a year later, and the court holds that she had a cause of action in May 1999. Id. at 398.  None of these cases hold, however, that the claim accrues when defendants act to disrupt the contract.  The accrual happens when disruption becomes actual or when a plaintiff receives notice that disruption will occur in the future.

    However, as to the date when Plaintiffs' claim accrued, we disagree with Plaintiff that the disruption occurred in late December or January at the earliest.  Plaintiffs received notice of the Vanguard email when it was sent in October 2006, and the alleged result of that email, the close-out announcement, came in November of 2006.  Therefore, we conclude that at the very latest, Plaintiffs' claim accrued in November of 2006 when Plaintiffs were notified that the State would close out its contract with Plaintiffs, even if actual close-out did not occur until later.  It was on that date that Plaintiffs were made aware that Defendants' actions, if those actions were indeed the reason the State chose to end its contractual relationship with Plaintiffs, actually resulted in disruption of the contractual relationship, even if that disruption was not scheduled to occur until a later time. Plaintiffs did not file this action until December 28, 2009, and their claim is, therefore, time-barred.

    We note that Plaintiffs argue that the close-out itself was not a breach, and the breach came later, when the State decided to discontinue payments to Plaintiffs when Plaintiffs refused the termination agreement.  However, Plaintiffs have not alleged any

12

specific allegations that support a causal link between the State's decision to breach the agreement when close-out failed and Defendants' actions. The allegations show, at the most, that Defendants urged the State to end the relationship with Plaintiffs, the State announced its decision to do so in November, and several months later, without any intervening act by Defendants that is alleged in the complaint, the State chose to breach its contract with Plaintiffs rather than attempt to close out the relationship mutually as it had allegedly announced it would do following Defendants' urging. Therefore there is no causal connection shown between the State's alleged breach and Defendants' prior actions, which at most resulted in the State's announcement to close out the contract. If a mutual close-out of the contract is not a breach, Plaintiffs' complaint does not allege that any specific actions of Defendants were tortious interference with a contract. If mutual close-out is a breach, Plaintiffs' claim is time-barred.

Even if Plaintiffs could show a causal link between Defendants' acts and the State's alleged breach, the claim accrued when the State announced its intention to end the relationship in November of 2006. At that time, Plaintiffs had notice that Defendants were urging the State to end the relationship, and notice that the State intended to do so. Plaintiffs could have brought a claim at that time, or within three years of that date. Therefore, Plaintiffs' claim must be dismissed.

While Plaintiffs' claim shall be dismissed on statute of limitations, the Court notes that Plaintiffs' claim is deficient in other ways. Plaintiffs have previously been granted a chance to

13

amend their complaint in order to state a proper claim.  While leave to amend should be freely given when justice so requires, Plaintiffs' amended complaint merely adds vague conclusory allegations of fraud and coercion that are not supported by any specific facts.  Because Plaintiffs have failed to allege a proper claim despite an opportunity to amend, and because the claim is time-barred, dismissal shall be with prejudice.

### III. Conclusion

**IT IS, THEREFORE, HEREBY ORDERED** that Defendants Upromise, Inc. and Upromise Investment, Inc.'s motion to dismiss (#48) and Defendant The Vanguard Group, Inc.'s motion to dismiss (#49) are **GRANTED**.  Plaintiff's amended complaint (#45) is dismissed with prejudice.

The Clerk shall enter judgment accordingly.

DATED: January 6, 2012.

*Edward C. Reed*
_____
UNITED STATES DISTRICT JUDGE